## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| AFFORDABLE CARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:21-cv-85-TBM-RPM |
| | ) | |
| versus | ) | JUDGE TAYLOR MCNEEL |
| | ) | |
| RAELINE K. MCINTYRE, DMD | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RAELINE K. MCINTYRE, DMD, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD
### AND REMAND TO THE AMERICAN ARBITRATION ASSOCIATION FOR A
### HEARING ON PLAINTIFF'S DAMAGES

Plaintiff, AFFORDABLE CARE, LLC, ("Plaintiff" or "Affordable"), moves this Honorable Court for an Order vacating the Final Decision and Award issued on March 19, 2021 by arbitrator Charles Holton in Affordable Care, LLC v. Raeline K. Mcintyre, DMD and Raeline K. Mcintyre, DMD, P.C., American Arbitration Association Commercial Arbitration Tribunal AAA No. 01-19-0003-4957 ("the Arbitration Award").

The Arbitration Award was made in violation of the Federal Arbitration Act 9 U.S.C. §10(a)(1-4) and the rules of the American Arbitration Association because (1) there was an undisclosed relationship between the Arbitrator and counsel for Defendants that resulted in bias and evident partiality or corruption in the arbitrators, or either of them; (2) the arbitrator refused to hear evidence pertinent and material to the controversy, including evidence of a summary judgment decision by this Honorable Court on a material issue; (3) the arbitrator misbehavior prejudiced Affordable; (4) the arbitrator exceeded his powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made, and (after adopting a near identical recitation of the

Defendant's brief as his own arbitration decision) then awarded attorney fees and costs to Defendants, despite no claim having been made for same and no evidence presented regarding same during the hearing; (5) the Arbitration Award violates public policy; (6) the Arbitration Award does not arguably construe or apply the plain language of the Services Contract; (7) the Arbitrator knowingly violated the law; and, (8) the Arbitrator acted outside of the authority granted to him by the Parties and the Services Contract.

I.    **INTRODUCTION**

This lawsuit arises out of the Agreement to Provide Management Services to a Dental Practice (the "MSA") between Affordable and Raeline K. McIntyre, DMD ("Dr. McIntyre") and Raeline K. McIntyre DMD, P.C. (the "Practice")(collectively, "Defendants").  In separate litigation between Affordable and Dr. McIntyre's entity, JNM Office Property (which owns the building at issue), this Court has already issued summary Judgment in favor of Affordable; there remains pending Affordable's claim for damages for wrongful eviction (the "JNM Litigation").[1]

The contracts at issue in (1) the JNM litigation and (2) the arbitration, both include provisions that require a written agreement in order to modify or amend the contract.  However, in the JNM Litigation, Defendants successfully argued that Affordable waived its rights under the contract by knowing of a breach for years, but failing to act.  In the arbitration, however, Defendants took the opposite position – arguing that breaches that occurred five years before the termination of the contract could not be waived.  Prior to the arbitration decision, Defendants explicitly conceded that this Court's waiver holding "is consistent with North Carolina case law regarding the non-breaching party's waiver of the right to complain about a breach of contract."  The arbitrator nonetheless ignored this Court's holding and held that Defendants could take contrary positions on waiver in related

---

[1] *Affordable Care, LLC, v JNM Office Property, LLC*, No. 1:19-cv-827-HSO-JCG, United States District Court for the Southern District of Mississippi.

litigation and be successful on both positions. As discussed further, *infra,* the arbitrator went on to issue a final decision that grossly exceeded his powers (including an award of attorney's fees for Defendants despite the fact that they had made no counterclaims for such), and that was blatantly contrary to the facts and evidence presented.

Just a day after the arbitrator's decision was issued, Affordable learned the obvious reason for the Arbitrator's one-sided view of the facts and law: the North Carolina counsel retained by the Defendants on the eve of the arbitration hearing had a close professional and legal relationship with the Arbitrator. Incredibly, Defendants' counsel was lead counsel for the university that employs the Arbitrator as a professor. Moreover, Defendants' counsel was a co-faculty member with the arbitrator for many years and even during the hearing in this arbitration. Despite the attorney/client relationship and the co-faculty positions shared with Defendants' counsel, the Arbitrator did not disclose the relationship.

As set forth below, the Arbitrator's Decision is fraudulent, fails to draw its essence from the MSA and is based on the Arbitrator's strong bias in favor of his counsel and co-faculty member. Accordingly, based on uniform Fifth Circuit authority, the Arbitrator's decision should be vacated and this matter remanded to the American Arbitration Association for a damages hearing in front of a newly appointed, non-biased Arbitrator. 9 U.S.C. § 10.

## II.    **RELEVANT FACTS**

This factual statement is based on the Declaration of Karol Twilla that attaches the relevant arbitration pleadings, exhibits and transcripts. (Declaration of Karol Twilla attached hereto as Ex. A). The Declaration also sets forth the evidence related to the failure to disclose a significant conflict by Defendants and the Arbitrator, but Affordable has filed a Motion for Discovery into the Arbitrator's Conflict contemporaneously with this Motion. To date, Defendants have refused to participate in a

Rule 26(f) conference, thereby preventing the progression of discovery. Affordable will seek leave to supplement this Motion once it has been allowed to complete discovery into the Arbitrator's Conflict.

The complete statement of facts from the Arbitration with cites to the hearing transcript is set forth in Affordable's Post-Hearing Brief and Proposed Final Decision. (Declaration of Twilla at Exs. 32 and 33 (hereinafter "Dec. Twilla at __")). Those factual statements are incorporated herein. This Statement of Facts highlights the material and undisputed facts that require the Arbitration Award to be vacated.

A.     **This Lawsuit Arises Out of a Services Contract Between a Dental Support Organization and a Dental Practice.**

Affordable is a dental-support organization that provides "non-clinical business services" to affiliated dentists. (Dec. Twilla at Hearing Transcript Day One, 76 (hearing pages are cited as ("D__") and arbitration exhibits are referred to as "TR at __")). These include, but are not limited to, services related to the affiliated practice's marketing, real estate, and an on-site laboratory. (D1, 76). Every dentist affiliated with Affordable enters into a Master Services Agreement ("MSA") that sets forth the rights and obligations of the parties. (D1, 78-79).

On November 1, 2002, Dr. McIntyre purchased the assets of a dental practice affiliated with Affordable. (TR at Joint Ex. 6). The Practice is a professional corporation formed by Dr. McIntyre to affiliate with Affordable. (TR at Joint Ex. 3). The Practice and Affordable entered into a MSA on November 1, 2002. (TR at Joint Ex. 3). The MSA has a twenty-year term which may be terminated with cause. (TR at Joint Ex. 3, Section (V)(A) and (V)(B)).

B.     **The Parties Had a Long and Successful Contractual Relationship.**

The Practice was affiliated with Affordable from November 1, 2002 until February 24, 2020. (TR at Joint Exs. 3) (Dec. Twilla at ¶7). Dr. McIntyre confirmed in testimony that she and the Practice provided excellent dental care to patients throughout the affiliation with Affordable. (D5, 115). By 2017, the Practice reached three million dollars in annual revenue. (D1, 166-167). Dr.

McIntyre's take-home compensation increased to the range of $600,000 to $700,000 annually. (D1, 89 and 93). Consistent with the success of the Practice, in 2007 Dr. McIntyre's husband, Neil McIntyre, sold his own dental practice and became a full-time employee of the Practice. (D3, 178).

In the early 2000's, Dr. McIntyre and Neil McIntyre began exploring the possibility of building and owning a new location for the Practice. (D5, 119). The McIntyres formed JNM Office Property, LLC ("JNM") to construct and own the new office building (D3, 242 and 254) located at 505 Cowan Road, Gulfport, Mississippi 39507 (the "Cowan Road Location"). (Joint Ex. 7, Section 1). On July 24, 2014, Affordable entered into a lease agreement with JNM for the Cowan Road Location. (the "JNM Lease Agreement"). (TR at Joint Ex. 7). The initial term of the JNM Lease Agreement is twelve years. (TR at Joint Ex. 7, Section 3).

The Practice opened in the Cowan Road Location in August 2014. (D3, 255). Dr. McIntyre admitted that she was happy and approved of the move. (D5, 116). Dr. McIntyre believed that the Cowan Road Location was better for the Practice's patients. (D5, 117). Dr. McIntyre also admitted that she benefitted from the Cowan Road Location as the owner of JNM. (D5, 118).

### C.    There Is No Documentary Evidence of Issues Between the Parties Until 2019.

Prior to September 2019, Dr. McIntyre never raised any significant concerns or issues with Affordable. (D1, 100-101 and 167). Indeed, the first documents showing any disputes between the Practice and Affordable are two letters sent by the Practice on September 18, 2019. (TR at Joint Ex. 8); (D1, 100-101). Dr. McIntyre admits that she was not familiar with the MSA until sending these letters. (D5, 180-181). The September 18, 2019 letters indicate a desire to disaffiliate from Affordable and give November 4, 2019 as the proposed disaffiliation date. (TR at Joint Ex. 8).

Relevant to the Arbitrator's Decision, one of the letters was a "Notice of Termination" regarding the MSA. (TR at Joint Ex. 8). As to a basis or "cause" for its Notice, first the Practice cited Section V(B)(9) of the MSA (TR at Joint Ex. 8) and claimed that the Office Lease terminated when

the Practice moved into the Cowan Road Location in 2014.  (TR at Joint Ex. 8).  Thus, the Practice

contends that the MSA was breached. Dr. McIntyre admits, however, that she never raised the lease

issue with Affordable prior to September, 2019.  (D5, 179); (D1, 158).  Dr. McIntyre never asked

Affordable to enter into a new written sublease because "that was not [her] job."  (D5, 179).  In fact,

Dr. McIntyre admitted that the lack of a sublease was not an issue until she was reading the MSA to

try and find a basis for ending the relationship with Affordable.  (D5, 180).

As its second basis for termination, the Practice cited an alleged breach of Section V(B)(2),

(TR at Joint Ex. 8), which provides:

> (2) A breach by either party of any material provision of this
> Agreement or any other agreement between PC and Manager or an
> affiliate of Manager; provided, that, if such breach is subject to cure,
> the breaching party shall have a reasonable period (not to exceed thirty
> (30) days) after notice of such breach from the other party to cure such
> breach, and if such breach is cured, then such breach shall not be
> grounds for termination unless repeated;

(TR at Joint Ex. 3).

The Practice gave three facts to allegedly support its desire to terminate.  (1)First, there was a

one-time implant ordering issue that occurred in 2019.  (D4, 489).  (2) Second, there was an alleged

issue regarding purchase of 3D imaging equipment, which was ultimately purchased in August, 2016.

(D4, 487).  No equipment issues arose after 2016.  (D1, 172).  (3) Third, the Practice alleged a failure

to increase associate dentist salaries.  (D4, 488).  Dr. McIntyre admits that she has no documents to

prove this claim.  (D5, 194-195).  Neil McIntyre testified that he could not recall the date of the

requests or the salary increases sought.  (D3, 216-217).  In addition, it is undisputed that the Practice's

two associate dentists were paid more than similar dentists at other affiliated practices.  (D1, 177).

Affordable responded to the Notice on September 27, 2019.  (Joint Ex. 9).  Affordable's

position was that the ADDL Agreement and the MSA "remain in full force and effect. . . ."  (TR at

Joint Ex. 9).  Dr. McIntyre did not respond to the letter.  (D1, 184).  Rather, the Practice continued

to operate as normal until February 24, 2020.  (Day One, pg. 184).

**D.**    **Affordable Files Declaratory Judgment Actions.**

On November 1, 2019, Affordable instituted the JNM Litigation in federal court wherein it sought (and successfully obtained), a judgment declaring that its lease of 505 Cowan Road has not been breached, and keeping Affordable in possession of the Cowan Road Location. (TR at Affordable Ex. 44). On the same day, Affordable filed an arbitration demand seeking to confirm that the contracts between the Practice and Affordable remained in full force and effect. (D1, 107).

The JNM Litigation (in federal court) and the arbitration are related matters because they involve the same parties and the same underlying controversy. (Dec. Twilla at ¶22). Lead counsel for the Parties are the same in the Federal Lawsuit and the arbitration. (Dec. Twilla at ¶22). More importantly, Dr. McIntyre controls the Federal Lawsuit and the arbitration. (Dec. Twilla at ¶22). Dr. McIntyre has a financial interest in both this arbitration and the Federal Lawsuit. (Dec. Twilla at ¶22). Moreover, JNM is the landlord for the office where the Practice operated. (Dec. Twilla at ¶22).

Notably, on December 6, 2019, while the Practice was still complying with the MSA, JNM entered into a Joint Stipulation with Affordable. (TR at Affordable Ex. 44). The Joint Stipulation confirmed that the "Parties wish to maintain the current status quo. . . ." (TR at Affordable Ex. 44, pg. 2). Based on this joint wish, the Parties stipulated and agreed that Affordable "shall remain in possession of [the Cowan Road Location] pending further agreement by the Parties or a ruling by this Court as to whether the Lease Agreement is continuing or whether it has been terminated." (TR at Affordable Ex. 44, pg. 3). Despite this agreement, and as discussed further, *infra*, the McIntyres unlawfully evicted Affordable in February of 2020.

**E.**    **Defendants Unlawfully Terminate The MSA.**

On January 17, 2020, a preliminary hearing was held in the Arbitration. February 17, 2020 was set as the last day to amend the pleadings. February 24, 2020 was the witness disclosure date. (TR at Affordable Ex. 34). With calculated timing, on February 17, 2020, Dr. McIntyre created a new practice

entity, Raeline McIntyre, DMD, PLLC (the "Raeline PLLC"). (TR at Affordable Ex. 15). On February 24, 2020, Respondents sent notice that they were "immediately" terminating the MSA. (TR at Joint Ex. 13). Relevant to this Motion, the February 24, 2020 termination letter does not reference the September termination letters and relied on a new provision of the MSA as a basis for its termination. (TR at Joint Ex. 13).

Also on February 24, 2020, the last deposit into the Practice's checking account was made by Dr. McIntyre. (D3, 221); (TR at Affordable Ex. 7). All patient revenue after February 24, 2020 was directed to Raeline PLLC's new checking account. (D3, 222). All Practice assets were transferred to Raeline PLLC without any written agreement or consideration. (D3, 197). Dr. McIntyre made clear that these "intentional" actions were done in order to divert patients and revenue from the Practice to Raeline PLLC. (D5, 170).

Raeline PLLC continued to offer economy denture services and offered the same services to former Practice patients. (D3, 230-231 and 272-273). Raeline PLLC also continued to work in the Cowan Road Location and it had no intention of leaving. (D3, 241). Without any contractual right to remain in the Cowan Road Location, Dr. McIntyre filed a state court action to enjoin Affordable from stopping her continued practice of dentistry. (TR at Affordable Exs. 16-17). The state court injunction, however, was removed to this Court. (TR at Affordable Ex. 43). On March 17, 2020, based on the Joint Stipulation, this Court ordered Dr. McIntyre to vacate the Cowan Road Location by March 27, 2020 and to not remove Affordable's equipment, supplies, furniture and other appurtenances. (TR at Affordable Ex. 1).

As with the AAA dates, Dr. McIntyre immediately reacted and created Neil McIntyre, DMD, PLLC ("Neil PLLC"). (TR at Affordable Ex. 46); (D3, 280). All of the assets owned by Raeline PLLC were then transferred to Neil PLLC without an agreement or consideration. (D3, 197 and 281). All patient files were transferred to Neil PLLC. (D3, 283-284). Neil PLLC hired all of the Raeline PLLC

employees, including the former ADDL employees, and continued to practice in the economy denture segment. (D3, 199). In fact, the prices and services offered by Neil PLLC are nearly identical to those of the Practice. (D3, 229); (TR at Affordable Exs. 47, 69, 70). Neil PLLC's marketing materials inform patients: "New Location Same Great Doctors." (TR at Affordable Ex. 6).

### F. Just Seven Weeks Before Arbitration, Defendants Retain Additional Counsel, and Seek a Continuance

Affordable was granted leave to amend its arbitration demand after Defendants repudiated the MSA. (Dec. Twilla at ¶30). The Arbitrator issued a Report of Preliminary Hearing and Scheduling Order on March 5, 2020. (Dec. Twilla at Ex. 25, ¶30). The date for the arbitration hearing was originally scheduled for September 8-10, 2020 and it remained the same after the amendment. (Dec. Twilla at Ex. 25, ¶30).

On June 4, 2020, Defendants filed their Answer to Affordable's amended arbitration demand. (Dec. Twilla at Ex. 26, ¶31). The Answer did not include any counterclaims. (Dec. Twilla at Ex. 26, ¶31). At the time of the Answer, Defendants were represented by the Balch & Bingham LLP law firm. (Dec. Twilla at Ex. 26, ¶31). All written discovery and depositions in the Arbitration was handled by the Balch & Bingham LLP firm. (Dec. Twilla at ¶31).

The arbitrator originally selected by the Parties withdrew from the matter in June of 2020 due to Covid-19 concerns. (Dec. Twilla at ¶32). Through the AAA process a new arbitrator, Charles Holton ("Holton") was selected. (Dec. Twilla at ¶33). Rule 17(a) of the AAA Commercial Rules required Holton, the Parties and counsel to fully disclose their relationships:

> Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

(Dec. Twilla at ¶33). Holton completed the General Arbitrator Oath Form on June 19, 2020. (Dec. Twilla at Ex. 27, ¶34). At the time, Holton had no conflicts with the parties or counsel involved in the arbitration. (Dec. Twilla at ¶34).

On July 22, 2020, however, a new law firm, Ellis & Winters LLP (the "Winters Firm") entered an appearance on behalf of Defendants in the arbitration. (Dec. Twilla at ¶35). This surprise enrollment came after Holton's appointment as arbitrator, more than ten months into the arbitration proceeding, after the close of discovery, and just seven weeks before the scheduled arbitration hearing. The Winters Firm did not disclose any conflicts or connections to Arbitrator Holton at all. (Dec. Twilla at ¶35). On July 23, 2020, the Arbitrator provided the following supplemental disclosure of his conflict:

> I would disclose that I know Mr. Sun and probably have had one or more cases with him or against him during my career, but nothing in the last 10 years. **I do not believe that I have seen or communicated with him in over 10 years. His involvement would not affect my judgment in the case**.

(Dec. Twilla at Ex. 28, ¶36) (emphasis added).

On August 7, 2020, Defendants notified the Arbitrator that Paul Sun had been in an accident on July 31, 2020 and was recovering from his injuries. (Dec. Twilla at ¶37). As of the date of the accident, Sun had been involved in the arbitration for <u>eight days</u> and had billed only 7.7 hours (Dec. Twilla at ¶37).

On August 18, 2020, Defendants advised the Arbitrator that Sun was unable to participate in the September hearing and moved for a continuance. (Dec. Twilla at ¶38). On August 25, 2020, despite Sun's limited involvement in the arbitration, the Arbitrator granted Defendants' motion to continue the long-scheduled arbitration hearing. (Dec. Twilla at ¶38).

Ultimately, the hearing was held in December, 2020. (Dec. Twilla at ¶39). Due to the fact that Defendants had not asserted any counterclaims, Defendants did not present any exhibits or evidence in the hearing relating to attorney fees incurred. (Dec. Twilla at ¶39). The Arbitrator's

Decision was issued on March 19, 2021 following two oral arguments held after the hearing. (Dec. Twilla at ¶39). Following the first oral argument, however, Arbitrator Holton spontaneously indicated to the Defendants that they could submit evidence of their attorney fees – despite no counterclaims having been asserted. (Dec. Twilla at ¶39).

The second oral argument was based on this Court's summary judgment order issued on March 2, 2021. (Dec. Twilla at ¶40). One of the primary legal issues raised in the post-hearing briefs was whether a right to terminate the MSA could be waived by the Defendants' ongoing and lengthy conduct continuing under the MSA. (Dec. Twilla at ¶40). If the arbitrator found (correctly) that the Defendants waived any objections to alleged breaches of the MSA by not taking action for years, then there was no cause for termination of the MSA and Affordable would have prevailed. Notably, in the JNM Litigation, the instant Court's summary judgment decision applied waiver in the JNM Litigation, based on JNM's own arguments, to the lease agreement between the parties. (Dec. Twilla at Ex. 29, ¶40). Affordable's judicial notice advised the Arbitrator:

> Highly relevant to this Arbitration, JNM argued that Affordable "waived any objection to the amount of rent paid during the first five-year period because it made at least 60 consecutive rent payments in this amount without any objection to that amount of rent." *See* Transcript, pg. 21. JNM and the Court cited Mississippi law that is consistent with North Carolina law on waiver. *See* Transcript, pgs. 21-22. The Judge reviewed the facts and held that Affordable waived its right to the overpayment based on the following finding of notice of the breach and no action: "[t]he undisputed evidence reflects that without objection Affordable Care had knowledge of its monthly rent payment and the construction costs, and voluntarily and willfully paid the rent amount for at least five consecutive years without objection." *See* Transcript, pg. 23. This waiver was found despite the fact that the Lease Agreement provides that any "changes" to the Lease Agreement "must be in writing signed by both parties." *See* Joint Exhibit 7, ¶18.

(Dec. Twilla at Ex. 29, ¶40).

Defendants responded to the supplemental authority prior to oral argument. (Dec. Twilla at Ex. 30, ¶41). Relevant to this Motion, Defendants conceded that Mississippi and North Carolina law were consistent on waiver:

> As the federal court explained, under Mississippi law, "[i]f after acquiring knowledge of the deviation from a known right articulated in the contract, a party fails to insist on its contractual rights or acts inconsistently with such rights, then that party waives the right to require such performance." Hr'g Tr. 22 (Cl.'s Notice Ex. 2). **This principle is consistent with North Carolina case law regarding the non-breaching party's waiver of the right to complain about a breach of contract**. *See* Resps.' Proposed Findings & Conclusions ¶¶ 213-15.

(Dec. Twilla at Ex. 30 (emphasis added), ¶41).

The only issue raised by Defendants at oral argument on the waiver issue was whether the parties were in privity. (Dec. Twilla at ¶42). Affordable provided supplemental authorities to the Arbitrator that firmly supported the privity of parties in the two matters. (Dec. Twilla at Ex. 31, ¶43). Despite (1) the oral argument, (2) a decision by the federal court directly adverse to his legal findings, and (3) extensive briefing, the Arbitrator ignored this key legal issue entirely in the Arbitrator Decision. (Dec. Twilla at Ex. 35). If the principle of waiver had been applied consistent with this Court's decision, Affordable would have wholly prevailed in the arbitration.

### G.    The Arbitrator's Decision Adopts Defendant's Brief, Virtually Wholesale.

The Arbitrator requested that the Parties submit proposed final decisions in advance of his ruling. (Dec. Twilla at ¶44). Attached as Exhibit 36 to Twilla's declaration is a comparison of the Arbitrator's decision and Defendants' proposed final decision. (Dec. Twilla at Ex. 36). This comparison makes obvious that the Arbitrator did not conduct an independent review of the hearing transcript and law. (Dec. Twilla at ¶45). A list of the clear factual misstatements that the Arbitrator adopted unquestioningly from the Defendants' briefing are attached as Exhibit 37 to Twilla's Declaration. (Dec. Twilla at Ex. 37).

The Arbitrator granted judgment in favor of Defendants on all of Affordable's claims. (Dec. Twilla at ¶46). In addition, despite the fact that the Defendants asserted no counterclaims, never presented evidence of attorney fees during the hearing, and that there was no basis under applicable North Carolina law for such award, the Arbitrator ordered Affordable to pay Defendants' attorney

fees in the amount of $379,168 and costs in the amount of $14,430.75. (Dec. Twilla at ¶46). Notably the majority of these fees were accrued in the short period of time since Sun's enrollment in this matter.

As to the merits, the Arbitrator incredibly held that Defendants somehow terminated the MSA on September 18, 2019 despite the undisputed fact that Defendants complied with the MSA for another six months. (Dec. Twilla at Ex. 35, pg. 61). As to the grounds, the Arbitrator found that Defendants had cause to terminate the MSA pursuant to Sections V(B)(2) and V(B)(9) (Dec. Twilla at Ex. 35, pgs. 62-69). As to waiver, the Arbitrator found no evidence of waiver; wholly failing to cite or reference this Court's summary judgment decision. (Dec. Twilla at Ex. 35, pgs. 69-74).

### H.    Holton and Paul Sun Failed to Disclose Their Close Connections.

Holton is now a full-time law professor for Duke University. (Dec. Twilla at ¶48). Prior to joining Duke Law, Holton worked in private practice. (Dec. Twilla at ¶48) and represented Duke University in many lawsuits from 1983 through 2005. (Dec. Twilla at ¶48). Holton's published lawsuits for Duke University confirm that he jointly represented, at times, both Duke University and professors of Duke University. (Dec. Twilla at ¶48).

In addition to his professor duties, Holton is the Director of Duke Law School's Civil Justice Clinic. (Dec. Twilla at ¶49). The Civil Justice Clinic is a partnership between Duke Law and the Legal Aid of North Carolina. (Dec. Twilla at Ex. 40, ¶49). Holton is the former chair of the board of directors for Legal Aid of North Carolina. (Dec. Twilla at ¶49). The Winters Firm touts its involvement in the Legal Aid of North Carolina as one of its seven, firm pro bono activities. (Dec. Twilla at Ex. 38, ¶50).

More importantly, Paul Sun and the Winters Firm took over representation of Duke University following Holton's long representation. (Dec. Twilla at ¶51). Sun's experience section of his firm's website includes multiple cases representing Duke University. (Dec. Twilla at Ex. 39, ¶51). Finally,

during the course of the arbitration, Sun became a member of Duke Law's faculty. (Dec. Twilla at Ex. 41, ¶52). Specifically, Sun is a faculty member for Duke Law in its "Wintersession 2021." (Dec. Twilla at ¶53). Sun and the other faculty members taught classes during the weekends of Friday, February 19 – Sunday, February 21, and Friday, March 12 – Sunday, March 14. (Dec. Twilla at ¶53). All of these faculty sessions took place during the briefing and oral arguments portion of the arbitration. (Dec. Twilla at ¶53).

Incredibly, registration for Winter session opened on December 11, 2020. (Dec. Twilla at ¶54). Accordingly, Sun was awarded a faculty position prior to the Arbitration hearing. (Dec. Twilla at ¶54). In fact, the Fall 2013 Duke Law Magazine states that Sun regularly teaches a class during the Wintersession. (Dec. Twilla at ¶54). Despite the fact that Sun and the Arbitrator were both Duke Law faculty members during some or all of the arbitration, at no point did Sun, Defendants, the Winters Firm, or Holton disclose the strong connections between Sun, the Winters Firm and the Arbitrator. (Dec. Twilla at ¶54).

### I.    **Affordable Learned of the Conflict After the Arbitrator Issued His Decision.**

The Decision was issued on March 19, 2021, but not circulated to the Parties until March 22, 2021. (Dec. Twilla at ¶55). Affordable learned of the contacts between the Arbitrator, Paul Sun, and the Winters Firm on March 20, 2021 through research into North Carolina law for another lawsuit. (Dec. Twilla at ¶56). Upon learning of the conflict, Affordable asked the American Arbitration Association whether it had a process to review the Arbitrator's conflict in this matter. (Dec. Twilla at ¶57). The American Arbitration Association verified that neither the Arbitrator nor the Winters Firm disclosed their connections during the Arbitration, but the American Arbitration Association does not have a process to review conflicts after a final decision has been issued. (Dec. Twilla at ¶57).

### III. **LAW AND ARGUMENT**

The Federal Arbitration Act ("FAA") provides various "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *21st Fin. Servs., LLC v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014) (*quoting Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008)). The FAA directs that a district court must grant an order confirming an arbitral award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Court may vacate an award if: "(1) the award was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or (4) the arbitrators exceeded their powers." *Id.* at 336 (*quoting Harris v. Parker Coll. Of Chiropractic*, 286 F.3d 790, 792 (5th Cir. 2001)).[2]

An award may be modified or corrected: (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award; (b) where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted; and (c) where the award is imperfect in matter of form not affecting the merits of the controversy. 9 U.S.C. § 11

---

[2] Section 10 of the Federal Arbitration Act provides as follows:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Further, the district court order "may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." *Id.* These sections provide "the FAA's exclusive grounds for expedited vacatur and modification." *Hall Street*, 552 U.S. at 584.

### A. The Court Should Vacate the Award Due to Fraud.

Section 10(a)(1) provides that an arbitration award may be vacated on the basis of fraud if (1) the fraud occurred by clear and convincing evidence; (2) the fraud was not discoverable by due diligence before or during the arbitration hearing; and (3) the fraud was materially related to an issue in the arbitration." *Morgan Keegan & Co. v. Garrett*, 495 F. App'x 443, 447 (5th Cir. 2012) (quoting *Barahona v. Dillard's, Inc.*, 376 Fed. Appx. 395, 397 (5th Cir. 2010)); see also *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004). Further, "[i]t is not necessary to establish that the result of the arbitration would have been different if the fraud had not occurred." *Id.* (quoting *Karaha Bodas*, 364 F.3d at 306-07). However, § 10(a)(1) does require "a nexus between the alleged fraud and the basis for the panel's decision." *Id.* (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990)).  The Fifth Circuit has recognized that fraud requires a showing of bad faith during the arbitration proceedings.  **The undisclosed bias of an arbitrator is an enumerated action that will satisfy this requirement** (along with bribery or willfully destroying or withholding evidence.) *Morgan Keegan*, supra, at 447, citing *Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 304 (S.D. Tex. 1997), aff'd and adopted by, 161 F.3d 314 (5th Cir. 1998).

### B. The Arbitrator Had an Undisclosed Bias and Partiality.

Pursuant to §10(a)(2) an award may be vacated if there is evident partiality or corruption in the arbitrator(s).  The test for evident partiality in nondisclosure cases in the Fifth Circuit is set out in *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278 (5th Cir. 2007) (en banc) and further discussed in *OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*, 975 F.3d 449 (5th Cir. 9/14/2020).

In *Positive Software*, the Fifth Circuit stated that an arbitrator's award may be vacated due to evident partiality if the conflict and its nondisclosure involve a "reasonable impression of bias" stemming from "a significant compromising connection to the parties" *OOBG Am. L.L.C.*, at 453, *citing Positive Software Solutions, Inc.* at 283. Notably, the *Positive Software* decision was not unanimous, with a strong six-person dissent inclined to use a bigger net.  In his dissenting opinion, Judge Weiner (concurring in Judge Reavley's dissent) noted that, due to the nature of arbitration, the standard for whether an arbitrator must make a disclosure is broader than the standard of what will disqualify him.

> I refer in general to the key differences between arbitration under the FAA and litigation in federal court; I refer in particular to one difference that is of prime significance in this case, viz., the disparate ways that the decision maker ---- an Article III judge on the one hand and an arbitrator on the other ---- is selected, and the unique role of the potential arbitrator's unredacted disclosure of his relationships with the parties and their counsel to ensure selection of an impartial arbitrator. **These general and particular differences underscore why such full and fair disclosure by a potential arbitrator of every conceivable relationship with a party or counsel, however slight, is a prerequisite. No relationship with a party or a lawyer is too minimal to warrant its disclosure, even if, in the end, it might be deemed to be too minimal to warrant disqualification.** Such an evaluation by the potential arbitrator, and any withholding of information based on it, are simply not calls that he is authorized to make. . .

*Id.*, at 286 Emphasis added.

Further, the *Positive Software* decision purports to be founded in the Supreme Court's holding in *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968).  The *Commonwealth Coatings Corp.* decision has been the subject of much discussion and the eventual split among the circuits regarding the bar a litigant must meet to succeed in a motion to vacate an arbitration award due to evident partiality.  As recently as October 2019, in *Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130 (9th Cir., Oct. 22, 2019), *cert. denied, Monster Energy Co. v. City Bevs. LLC*, 207 L. Ed. 2d 1100, 2020 U.S. LEXIS 3430, 2020 WL 3492685 (U.S., June 29, 2020) the Ninth Circuit vacated an arbitration award and held that the standard for vacating an award due to "evident partiality" requires a two part showing: (1) that an arbitrator's undisclosed interest in an entity

(such as JAMS or a law firm connected to the case) is substantial; and (2) that entity's business dealings with a party to the arbitration are nontrivial. *Id.*, at 1135. Notably, the Supreme Court denied certiorari on *Monster Energy* and the correct interpretation of *Commonwealth Coatings* is as yet unresolved among the circuits.

Nonetheless, (and even applying the test articulated by the Fifth Circuit in *Positive Software Solutions, Inc.*), the law permits an arbitration award to be vacated if the party challenging the award can produce "specific facts from which a reasonable person would have to conclude that the arbitrator was partial to" its opponent. *Id.*, at 453, *citing WestEnd*, 832 F.3d at 545 (emphasis added). The facts of this case clearly meet that standard. In the case at bar, the arbitrator's connections to attorney Sun prior to and during the arbitration were clearly a "significant compromising connection." His failure to disclose the connections, on its own, is enough to warrant that the award be vacated pursuant to Section 10(a)(1) (fraud). Further, the resulting egregious award makes his evident partiality obvious.

Indeed, the decision and award are so contrary to the evidence and the prior rulings of this Court, and include such a clear violation of the arbitrator's authority that the only reasonable conclusion is that the arbitrator was biased, and displayed "evident partiality" to Defendants due to the nature of his relationship with their counsel. As described above, a different law firm represented Defendants throughout the complex history of the disputes among the parties and conducted all of the discovery and depositions in the Arbitration. Atorney Sun enrolled just a few weeks after Holton was selected as the new arbitrator. Soon after Sun's enrollment, the arbitrator began granting Defendants significant procedural and substantive advantages. For example, although Sun had only performed 7.7 hours of work on the file and had only been enrolled for eight days when he was involved in an accident, the arbitrator granted Defendants a continuance based on Sun's accident and inability to participate on the scheduled date. Further, Holton, *sua sponte*, requested that Defendants submit evidence of attorney fees despite no counterclaims having been asserted, and no evidence

having beenpresented during the hearing.  Holton subsequently granted Defendants an award of attorney fees - an act which is so clearly outside the scope of his authority it can only be the result of bias or partiality.  Finally, Defendants took a position with regard to waiver in the instant Court that completely contradicted the position they took at arbitration.  This Court ruled in their favor, holding that Affordable Care had waived its rights under the MSA by failing to act in a timely manner with regard to recovering overpaid rent.  However, Defendants took the opposite position concerning waiver at arbitration and argued that they could terminate the MSA due to the 2016 problem with an order and the allegations regarding termination of the Office Lease in 2014 when the practice moved.  Despite being fully aware of this Court's existing decision on the issue, the arbitrator ruled in contradiction to this Court's judgment, and in favor of Defendants.  This again can only be explained by evident bias.

Other courts have vacated arbitration awards in similar circumstances.  See *Schmitz* 20 F.3d 1043 (9th Circuit April 4, 1994).  In *Schmitz*, one of the arbitrators failed to disclose that his law firm had represented the parent company of a party to the arbitration.  The representation included approximately 19 cases over a period of 35 years.  The district court affirmed the award, stating that because the arbitrator was unaware of the conflict at the time of the hearing, there was no evident partiality.  However, the appellate court reversed and vacated the award.

Likewise, in *Thomas Kinkade Co. v. White* (2013 WL 1296238), the Sixth Circuit affirmed a lower court's decision vacating an arbitration award when the Chair of the Arbitration worked for a firm which had accepted an engagement that came to the firm from the arbitrator appointed by the Whites (the defendants), and another that was from David White himself.  The Chair disclosed the engagements but the Arbitration had been ongoing for a long time and the AAA denied Kinkade's motion to disqualify the Chair.  The Sixth Circuit ultimately held that the Chair afforded the Whites significant procedural and substantive advantages, such as allowing them to supplement the proof in

support of their damages claim, after the hearings, with documents improperly withheld for years. The tribunal ultimately awarded the Whites more than $1.4m, and denied a 'virtually uncontested' claim by Kinkade for the return of paintings that the Whites had not paid for.  Notably, *Kinkade* was decided in accordance with the Sixth Circuit's standard for vacating an award on the basis of evident partiality, which is the same as the majority of circuits, including the Fifth Circuit.  The Sixth Circuit held that the only plausible explanation for the significant favors provided to the Whites so late in the dispute was the Chair's partiality.  *Thomas Kinkade Co. v. White*, 711 F.3d 719, 724, 2013 U.S. App. LEXIS 6537, *13, 2013 FED App. 0087P (6th Cir.), 8, 2013 WL 1296238.  Further, the court held that by initiating business relationships with a party midway through the arbitration process, the Chair of the tribunal jeopardized the legitimacy of the process regardless of the disclosure given.  *Id.* At *14.

The circumstances herein are even more clearly evident of partiality.  In this instance, Sun and his firm had a long history of representing Duke University and its faculty members; thus, there was an attorney client relationship with Duke and its faculty, of which Holton was a member.  Per the North Carolina State Bar, "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." N.C. Rules Prof. Conduct 1.13.  Duke University is an organization represented by Sun who also employs Holton.  In fact, other courts have found that, "a 'party' includes an organization's employees with managerial responsibility; employees whose act or omission in connection with the matter may be imputed to the organization; and employees, whose statements may constitute an admission of the organization." *Metcalf v. Yale Univ.*, No. 15-cv1696 (VAB) (D. Conn. Dec. 27, 2017).  Further, the relationship between Sun and Holton and their representation of and employment by Duke University preceded the Arbitration, but became even more significant during the course of Arbitration, when Sun became a member of the faculty of Duke, and taught classes during the time the Arbitration was being briefed and oral arguments were being conducted.  There can be no doubt that Holton knew of Sun and his tie to the university

specifically.  As one example, Plaintiff's investigation of this conflict identified the published news report of a case of local notoriety, in which Paul Sun is quoted as Duke's lawyer: Ray Gronberg, *"Run over by a really bad process," Duke soccer player has his day in court*, The Herald Sun, (Feb. 13, 2018, 6:00 AM), https://www.heraldsun.com/news/local/counties/durham-county/article199782844.html .

These undisclosed connections make Holton's grant of procedural and substantive advantages to the Defendants all the more suspect: when one considers that Holton granted a continuance of the arbitration hearing based on the unavailability of his long-standing colleague Sun, who enrolled in the matter after the close of discovery, only eight days before his alleged accident, and at the time had billed only 7.7 hours to a long-standing matter.  Worse, despite the fact that no counterclaim had been asserted by the Defendants, Holton *sua sponte* requested their invoices and awarded fees in the amount of $379,168 and costs in the amount of $14,430.75. At the same time, the Defendants themselves argued in their Post-Hearing Brief in the Arbitration that North Carolina law precluded the award of fees and costs under the MSA.  (Dec. Twilla at Ex. 34).

Holton and Sun were co-workers and shared an attorney-client relationship by virtue of Sun's extensive and ongoing representation of Duke. In compliance with the American Arbitration Association Code of Ethics for Arbitrators in Commercial Disputes, there was an obligation for Holton to disclose, "any facts which might affect [his] neutrality, independence, or impartiality."  *See also Goswami v. DePaul University*, 8 F. Supp. 3d 1004, *1015; 2014 U.S. Dist. LEXIS 37919, **28. Holton failed to do so.  The relationship between Sun and Holton was known to Holton and was one that needed to be disclosed but was not.  Thus, the standard of evident partiality is met herein and the Arbitration Award should be vacated.

### C.    The Arbitrator Was Guilty of Prejudicial Misconduct.

Per Section 10 of the FAA, an arbitration award can be vacated when, as here, the arbitrators were guilty of misconduct that prejudiced the rights of one of the parties. See 9 U.S.C. § 10(a) (3).

"Misconduct" applies to more than just fraud or deceit; it includes unfair conduct regardless of motive or intent. See *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (order vacating arbitration award affirmed by Fifth Circuit where arbitrators lulled parties into believing that certain evidence had been admitted and then refusing to consider it).

Courts may set aside arbitration awards when "the arbitrators were guilty of misconduct in […] refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(c). Particularly apt here, awards will be vacated where parties are not provided the opportunity to, "present evidence without unreasonable restriction" and "to confront and cross-examine witnesses." *ICAP Corporates, LLC v. Drennan*, 2015 WL 10319308, at *6 (D.N.J. Nov. 18, 2015) (citation omitted); see also *Konkar Mar. Enters., S.A. v. Compagnie Beige D'Affretement*, 668 F.Supp. 267, 271 (S.D.N.Y.1987) ("When a party establishes that the arbitrators have refused to consider relevant evidence, however, courts are more likely to vacate an award."). In the instant matter, Arbitrator Holton engaged in such misconduct when he refused to consider the evidence of the arguments and summary judgment on the issue of waiver.

Disobedience of a court order is "misconduct" as a matter of law under 9 U.S.C. § 10(a)(3). "Misconduct" under 9 U.S.C. § 10(a)(3) includes unfair conduct regardless of motive or intent. See *Gulf Coast Indus. Workers Union*, 70 F.3d at 850. The misconduct must, "so affect the rights of a party that it may be said that he was deprived of a fair hearing." *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006). An award which contradicts a prior court order is, "misconduct which prejudices a party" and is grounds to vacate an award under 9 U.S.C. § 10(a)(3). *J-Hanna v. Tucson Dodge Inc.*, No. CIV 10-504-TUC-CKJ, 2014 WL 504881, at *2-4 (D. Ariz. Feb. 7, 2014). Misconduct is prejudicial if it has a "direct bearing on [an] arbitrators' liability determinations" of a party. See *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979).

As discussed *supra* in Section II.F., Arbitrator Holton improperly ignored this Court's own ruling on the application of waiver and failed to adequately address such in his decision.  If applied correctly, Affordable would have prevailed.  Thus, this misconduct alone is grounds for vacating the Arbitration Award.

### D.  The Arbitration Award Exceeded the Arbitrator's Powers.

Alternatively, the Court should vacate the Arbitration Award because the award, particularly the award of attorney fees and costs, which were never claimed by Defendants, well exceeded the Arbitrator86's power.  An arbitration award may be vacated in federal court in instances in which the arbitrator exceeded his or her powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. See 9 U.S.C. § 10 (a)(4).

An arbitrator exceeds his power when he issues an award on an issue that was not submitted to him or her. *Intl. Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Texas Steel Co.*, 639 F.2d 279, 283 (5th Cir. 1981) ("An arbitrator can bind parties only on issues that they have agreed to submit to arbitration, and whether an arbitrator has exceeded those bounds is an issue that courts properly may decide"). In *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979), the Fifth Circuit vacated an arbitration award because the arbitration panel exceeded its powers by awarding damages arising from an issue that "was never placed in issue in the arbitration proceeding" and an award on that basis denied defendant its due process. *Totem Marine*, 607 F.2d at 651.  The Fifth Circuit found that by "ignor[ing] the arbitral dispute submitted by the parties and dispens[ing] their 'own brand of industrial justice,'" the arbitrators exceeded their powers within the meaning of 9 U.S.C. § 10(a)(4) and noted that, "[a]lthough arbitrators enjoy a broad grant of authority to fashion remedies, arbitrators are restricted to those issues submitted." 607 F.2d at 651-52.  See also *Container Products, Inc. v. United Steelworkers of Am.,* and its Loc. 5651, 873 F.2d 818 (5th Cir. 1989), (the Court affirmed vacatur of an arbitration award that modified an employer's disciplinary action taken

against an employee because the agreement to arbitrate did not authorize the arbitrator to modify disciplinary action finding that the arbitrator "clearly exceeded his authority.") Again, in *Matteson v. Ryder Systems, Inc.,* 99 F.3d 108, 115 (3d Cir. 1996) the Third Circuit reversed a district court and held the arbitrator exceeded its authority by deciding issues that had not been submitted by the parties. Importantly, the court held that "an arbitrator has the authority to decide only the issues actually submitted." *Id.* at 112-13 (citing *United Parcel Serv., Inc. v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 430,* 55 F.3d 138, 142 (3d Cir. 1995) ("An arbitration award will, of course, be enforceable only to the extent it does not exceed the scope of the parties' submission."); *United Steelworkers of Am. v. Enter. Wheel and Car Corp.,* 363 U.S. 593, 598 (1960) (upholding arbitration award but suggesting that were the award beyond the submission it would have been vacated). *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO,* 913 F.2d 544, 560-61 (8th Cir. 1990) (finding that an arbitrator acted outside his authority when the parties neither referred to the issue he decided in their opening briefs nor offered evidence on the issue); *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local* 664C, 532 F.3d 405, 415 (6th Cir. 2008) (holding that "[w]hen an arbitrator reaches a question not committed to him by the parties, he acts outside of his authority such that an order vacating such an award is appropriate."). See also P*iggly Wiggly Operator's Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union,* Local No. 1, 611 F.2d 580, 583 (5th Cir. 1980) (arbitrator "can bind the parties only on issues that they have agreed to submit to him"); *see also Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 301-02 (3d Cir. 2001) (vacating arbitration award where arbitrator "ruled on an issue that was not properly before him"), abrogated on different grounds, *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008); *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 515 (2d Cir. 1991) ("[I]f arbitrators rule on issues not presented to [them] by the parties, [they have] exceeded [their] authority and the award must be vacated.").

This has applied in instances in which an arbitrator awarded attorney's fees where there was no such claim submitted to him or her. *Offshore Marine Towing, Inc.* v. *MR23*, 412 F.3d 1254, 1256-58 (11th Cir. 2005) (modifying arbitration award where arbitrator ruled on attorneys' fees claim not submitted to him).  Arbitral actions contrary to express contractual provisions are not entitled to judicial confirmation. *Delta Queen S.B. Co. v. District 2 Marine Engineers & Beneficial Assn., etc.,* 889 F.2d 599, 604, 1989 U.S. App. LEXIS 18414, *15, 133 L.R.R.M. 2077, 113 Lab. Cas. (CCH) P11,692, 1993 AMC 1213.

In *Exxon Mobil Corp. v. Paper, Allied-Indus. Chem. & Energy Workers Int'l Union,* Local 4-12, 383 F. Supp. 2d 877, 877 (M.D. La. 2005), the court held an arbitrator exceeded its authority in making a ruling on an "implied issue" the arbitrator ruled on based on the arbitrator's study of the record. The court held it improper for arbitrators to rule on such implied issues that are not explicitly presented by the parties. *Id.* at 877.  The Supreme Court has made clear that arbitrators may not "stray[] from interpretation and application of the agreement and effectively dispense[] [their] own brand of industrial justice." *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010). When an arbitration panel acts in excess of its authority, its "decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [its] powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.* at 671-72.

An arbitrator also exceeds his power when he takes action that is contrary to an express contractual provision. *PoolRe Ins. Corp. v. Organizational Strategies, Inc.,* 783 F.3d 256, 265 (5th Cir. 2015). In *PoolRe*, the Court vacated an entire arbitration award because the arbitrator applied AAA arbitration rules, but the contract between the parties required the arbitrator to apply the International Chamber of Commerce's arbitration rules. The Court found that the arbitrator exceeded his authority in applying rules that were not those that the contract expressly specified.

These authorities demonstrate that an arbitrator exceeds his power when he issues an award on an issue that was not within his contractually established authority, and when his award is contrary to the terms of the contract between the parties. The above cited jurisprudence is on all fours with the facts of the case at bar. Thus, in awarding attorney fees and costs that were not a part of a counterclaim at Arbitration and were contrary to governing North Carolina law, the arbitrator exceeded his authority and his decision and award must be vacated.

## IV.    **CONCLUSION**

For the reasons set forth above, Plaintiff, AFFORDABLE CARE, LLC respectfully requests that this Honorable Court issue an Order vacating the Award and remanding this matter to the American Arbitration Association for further consideration. Alternatively, Affordable prays that the Award be modified to remove the improper grant of attorney's fees and costs to the Defendants. Further, Affordable prays for the award of its costs incurred in this matter, and for all other legal and equitable relief which may be available.

Respectfully submitted,

        /s/ Meredith A. Mayberry
MEREDITH A. MAYBERRY (MB #101796)
LEWIS BRISBOIS BISGAARD & SMITH LLP
400 Poydras Street, Suite 1300
New Orleans, Louisiana 70130
Telephone: 504-302-4100
Facsimile: 504-754-7569
Email: meredith.mayberry @lewisbrisbois.com

                and

STEPHEN B. SIMPSON
PURVIS & CO. PLLC
14110 Airport Rd, Suite A
Gulfport, MS 39503
Telephone: (228) 206-7174
Facsimile: (601) 510-7794
Email: ssimpson@purviscolaw.com

*Attorneys for Affordable Care, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon counsel of record for all parties by email transmission, the CM-ECF system, and/or First Class U.S. Mail, postage paid, this 17th day of June, 2021.

*/s/ Meredith A. Mayberry*
Meredith A. Mayberry

4814-3184-8175.1  27